UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
STOP & SHOP SUPERMARKET CO., LLC,  :
  :
  :
Plaintiff,  :
  :
  : **OPINION**
-against-  : 05 Civ. 9606
  : (LBS)
  :
  :
UNITED FOOD & COMMERCIAL  :
WORKERS' UNION LOCAL 342, AFL-CIO, CLC,  :
  :
Defendant.  :
  :
------------------------------------------------------------------x

December 5, 2005

Appearances:

*Plaintiff*

Michael C. Lehane
Thomas W. Colomb
MURPHY, HESSE, TOOMEY & LEHANE
300 Crown Colony Dr. Suite 410
P.O. Box 9126
Quincy, MA 02269-9126

V.P. dePillis
RAWLE & HENDERSON, LLP
Suite 4636, 46th Floor
140 Broadway
New York, NY 10005

*Defendant*

Philip J. Rizzutto
PHILIP J. RIZZUTTO, P.C.
One Old Country Rd, Suite 285
Carle Place, NY 11514
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAND, District Judge

Plaintiff Stop & Shop Supermarket Co., LLC ("Stop & Shop") moves under Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction and requests that Defendant United Food and Commercial Workers' Union Local 342, AFL-CIO, CLC ("Local 342" or "the union") be temporarily restrained from proceeding with its demand for arbitration. The arbitration demand involves the allegedly unilateral implementation of the "LMS system," an electronic system that collects and aggregates data on product sales. (Petr.'s Br. 2.) According to Stop & Shop, the LMS system is designed to increase the speed and efficiency of Stop & Shop's management of inventory and manpower, including the hours of employment of union members. The union seeks arbitration because it believes the implementation of the LMS system violates the collective bargaining agreement ("CBA") and is covered by the CBA's arbitration clause. Stop & Shop asserts that the arbitration clause in the CBA does not cover the implementation of LMS.

JURISDICTION

The Court has jurisdiction pursuant to § 301 of the Labor Management Relations Act. See 29 U.S.C. § 185(a) ("Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."). There has been no challenge by the union to the Court's jurisdiction.

1

"The term 'industry affecting commerce' means any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce." 29 U.S.C. § 142(1). Stop & Shop has more than 300 stores throughout New England, New York, and New Jersey. The union consists of scores of workers and a labor dispute over the implementation of the LMS system in Stop & Shop's stores would certainly tend to obstruct commerce. See Shirley-Herman Co. v. Int'l Hod Carriers, Bldg. & Common Laborers Union of Am., Local Union No. 210, 182 F.2d 806, 808 (2d Cir. 1950) ("The work stoppage resulted in slowing up the installation of sprinkler systems for two plants of the American Radiator & Sanitary Corporation, which is concededly engaged in interstate commerce.").

DISCUSSION

The fact that a bargaining agreement contains an arbitration clause does not relieve the court of its obligation to determine whether the arbitration clause covers a given claim. See AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). "[T]he question of arbitrability . . . is undeniably an issue for judicial determination." Id. This is no less true in the case of a preliminary injunction. "A party seeking preliminary injunctive relief must establish: (a) irreparable harm and (b) either (i) a likelihood of success on the merits of the underlying claim or (ii) sufficiently serious questions going to the merits of the claim as to make it a fair ground for litigation and a balance of the hardships tipping decidedly toward the movant." Sweeney v. Bane, 996 F.2d 1384, 1388

(2d Cir. 1993). Whether Plaintiff faces irreparable harm, has a likelihood of success on the merits, and whether the claim is a fair ground for litigation all depend on whether the terms of the arbitration agreement cover the implementation of LMS.

The Supreme Court listed the basic principles governing arbitrability disputes before the federal courts in three cases known as the "Steelworkers Trilogy." See United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593 (1960); United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564 (1960). The cases provided:

> (1) 'that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit,' (2) 'that the question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate a particular grievance—is undeniably an issue for judicial determination,' and (3) 'that, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims.'

Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979, 982 (2d Cir. 1997) (quoting AT&T Techs., Inc. v. Commc'ns. Workers of Am., 475 U.S. 643 (1986) (internal quotations and citations omitted)). Moreover, if a CBA contains an arbitration clause, "there is a presumption favoring arbitrability, particularly if the clause is broad and covers 'any differences' arising with respect to interpretation of the agreement." Maryland Cas. Co., 107 F.3d at 982 (citing AT&T Techs., Inc., 475 U.S. at 650). Thus, the standard for deeming a claim covered by the arbitration clause weighs in favor of the party seeking arbitration. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts

should be resolved in favor of coverage." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960).

While the presumption in favor of arbitration is strong, it does not alter the Court's role: "deciding whether the parties have agreed to submit a particular grievance to arbitration." AT&T Techs., Inc., 475 U.S. at 649. See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. A & M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc., 314 F. Supp. 2d 332, 345 (S.D.N.Y. 2004) (arbitration not binding upon defendant "merely because its adversary *alleges*" that arbitration is binding). When the "dispute is in respect of a matter that, on its face, is clearly collateral to the contract, then a court should test the [arbitrability] presumption." Collins & Aikman Prods. Co. v. Building Sys., Inc., 58 F.3d 16, 23 (2d Cir. 1995).[1] By contrast the Court "will order arbitration if the arbitration clause is broad and if the party seeking arbitration has made a claim that on its face is governed by the contract, even if the claim appears to be frivolous." Associated Brick Mason Contractors of Greater N.Y., Inc. v. Harrington, 820 F.2d 31, 35 (2d Cir. 1987).

Thus, though the existence of an arbitration clause in the CBA creates a presumption favoring arbitrability, the Court must determine whether the claim is governed by the terms of contract, and specifically whether "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960). "The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the

---

[1] It should do so by "reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 23 (2d Cir. 1995).

4

collective bargaining agreement does in fact create such a duty." John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547 (1964).

A.  THE ARBITRATION CLAUSE

The arbitration clause at issue is quite broad. The agreement states that "[s]hould differences arise between the Union and its members and the Employer as to the interpretation, application or enforcement of any of the provisions of this Agreement, except differences which arise involving contributions to the Welfare, Pension, Annuity, Safety-Education-Cultural or Legal Funds, they shall be handled [through a grievance and arbitration procedure]." CBA at 32. This broad language is the very kind that usually directs a ruling in favor of arbitration. See United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584-85 (1960) ("[I]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail . . . ."). See also Maryland Cas. Co., 107 F.3d at 982 ("[W]here the collective bargaining agreement contains an arbitration clause there is a presumption favoring arbitrability, particularly if the clause is broad and covers 'any differences' arising with respect to interpretation of the agreement.") (citing AT&T Techs., Inc., 475 U.S. at 650). The arbitration clause has language similar to the "any differences" phrasing. The agreement states that "[s]hould differences arise" involving the "interpretation, application or enforcement of any of the provisions of this Agreement, except differences which arise involving contributions to the Welfare, Pension, Annuity, Safety-Education-Cultural or Legal Funds" those differences "shall be handled in the following manner," namely a

5

grievance procedure followed by arbitration. CBA at 32. There is no contention that this grievance involves contributions to any of the mentioned funds. Given the broad arbitration clause and the limited exception, there is a strong presumption of arbitrability in this case, provided the union makes a colorable showing that the grievance "on its face is governed by the contract." Associated Brick Mason Contractors of Greater N.Y., Inc. v. Harrington, 820 F.2d 31, 35 (2d Cir. 1987).

B. THE GRIEVANCE

In a letter dated October 5, 2005, the union notified Stop & Shop's Director of Labor Relations that it intended to proceed to arbitration on a pending grievance: the unilateral implementation of the LMS system. The letter stated that the union had "demanded that the employer stop using [LMS] and pay our members for wages lost as a result of this violation." (Letter from Lisa O'Leary, Executive Vice President, Local 342, to Rick Meehan, Director of Labor Relations, Stop & Shop (Oct. 5, 2005).) Though the letter did not specify what, if any, provisions in the contract subjected this grievance to arbitration, counsel for the union subsequently raised several possible grounds for finding the grievance arbitrable.

At a conference with the Court on November 17, 2005, the union argued that Article 29 of the agreement, the "Prior Privileges" clause, covered the LMS implementation. That clause states that the "Employer agrees that any conditions other than those set forth in the Agreement and enjoyed by the employees in the Employer's employ, shall be continued in effect on behalf of such employees." CBA at 34. Counsel for the union alleged that "as a result of the implementation of the LMS system, the union

6

members are in fact actually resulting [sic] in a reduction of their hours and a reduction of their pay." (Hr'g Tr. 7, Nov. 17, 2005.) The union also asserted that Article I of the agreement covered the grievance. No explanation was given why that clause, "Union Recognition," should be seen as covering the implementation of LMS.[2] Finally, in papers filed with the Court, the union asserted that the CBA's clauses involving planned technological changes rendered the grievance arbitrable. That provision states that the "Employer agrees to discuss planned technological changes with the Union, in advance of said changes." CBA at 50. Moreover, Stop & Shop agreed to give notice of any new products or equipment to be introduced in its stores. "The Employer shall give one (1) month's written notice of any new product or equipment to be introduced into its stores(s), which product or equipment impacts upon the terms and conditions of

---

[2] That clause states:

> It is the intent and purpose of the parties to promote and improve industrial and economic relations between the Employer and the employees covered by this Agreement and to set forth the basic agreement covering rates of pay, hours of work and conditions of employment to be observed.
>
> A.   The operation of the Employer's business and the direction of the working forces, including, but not limited to, the establishment of the opening and closing times of stores, the right to hire, transfer, suspend, layoff, recall, promote, discharge for cause, assign or discipline employees from duty because of lack of work and to transfer employees from one store location to another, are vested exclusively in the Employer, subject, however, to the provisions of this Agreement.
>
> B.   The Employer recognizes the Union as the exclusive bargaining representative of all its employees in its stores herein, engaged in the cutting, wrapping and selling of all fresh and smoked meat, poultry, fish and such products customarily handled in the Meat Department at retail in its retail stores or supermarkets, and such additional classifications previously recognized by the Employer (as set forth in Schedule "A" herein), for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment or other better conditions of employment.

CBA at 4.

employment of the employees covered by the Agreement, and shall provide a description thereof and the date of introduction."[3] CBA at 50.

### C. THE GRIEVANCE IS ARBITRABLE

As noted above, the standard for determining the applicability of an arbitration clause weighs heavily in favor of arbitrability when a broad arbitration clause is present. The Court will not find a grievance beyond the bounds of an arbitration agreement "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960). The merits of the claim itself are irrelevant; the Court "will order arbitration if the arbitration clause is broad and if the party seeking arbitration has made a claim that on its face is governed by the contract, even if the claim appears to be frivolous." Associated Brick Mason Contractors Inc., 820 F.2d at 35.

On these facts, the Court cannot say with "positive assurance" that the CBA does not cover the LMS grievance. Indeed, the terms of the grievance itself, challenging the unilateral implementation of the system, on their face satisfy the requirement that the CBA be susceptible to an interpretation that it governs the dispute. The allegation of unilateral implementation is certainly understood as raising the question of whether Stop & Shop complied with the CBA's provision requiring the employer to "discuss planned

---

[3] At oral argument, counsel for Stop & Shop argued that the technological changes provisions were part of side letters not binding on the parties. This contention is rejected. Stop & Shop submitted to the Court the letter provisions and the other parts of the agreement as an indivisible, "true and accurate" copy of the CBA. (Petr.'s Br. 3.) The technological changes provisions are part of a letter, signed by Stop & Shop the same day as the other portions of the contract, which "confirms certain understandings reached during the negotiations resulting in the Agreement." Even if this portion of the contract were deemed severable and not binding upon Stop & Shop, the other portions of the CBA referenced herein are susceptible of an interpretation that they cover the LMS grievance.

8

technological changes with the union." It also raises the issue of whether Stop & Shop provided proper notice about a new "product or equipment" which affects the terms and conditions of employment. These are both claims that the CBA covers under any reasonable reading.

Moreover, a technological change that materially altered the working conditions of the union members sounds under Article 29, if the change deprives members of previously held privileges. The Court also notes that, while not specifically mentioned by the union, Article 8's provision regarding hours of work and Article 9's provision regarding wages are "susceptible of an interpretation that covers the asserted dispute." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960).[4] Of course, the technological change may turn out to be a frivolous change, or the change may be within management's prerogative. Article I of the CBA reserves Stop & Shop's right, subject to the provisions of the agreement, to "assign . . . employees from duty because of lack of work." CBA at 4. These questions, however, are questions for the arbitrator, not the Court.

The Court is mindful that certain claims cannot be considered within the bounds of the arbitration agreement. Stop & Shop raises the specter of attempts by the union to arbitrate Stop & Shop's use of a calculator or personal computer. (Petr.'s Supplemental Br. 12.) But as is clear from the provisions of the CBA and applicable precedent, the implementation of LMS may affect the terms and conditions of employment in a manner governed by the CBA. The implementation of the LMS system is a technological change

---

[4] Article 8 states, in relevant part: "A weeks' work for all regular full-time employees shall be forty (40) hours per week, consisting of five (5) eight (8) hour days." CBA at 12. Article 9 states: "Effective as of October 26, 2003, employees shall be paid all increases, classification rates, progression rates, premium pay, as set forth in Schedule 'A' annexed hereto." CBA at 15.

9

which on its face is governed by the contract, specifically the language of Articles 8, 9, 29, and the provisions regarding technological change.

### D. REQUEST FOR PRELIMINARY INJUNCTION

As the Court concludes that the grievance is within the arbitration agreement, the request for a preliminary injunction is denied. There would indeed be harm in having to arbitrate a question that is beyond the scope of the CBA. See Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations., 107 F.3d 979, 985 (2d Cir. 1997) ("[T]he time and resources [Plaintiff] would expend in arbitration is [sic] not compensable by any monetary award of attorneys' fees or damages pursuant to the provisions of the Agreement or the Arbitration Act."). But Stop & Stop has not demonstrated that this grievance is beyond the scope of the CBA, nor has it demonstrated a likelihood of success on the merits or sufficiently serious questions going to the merits. See Sweeney, 996 F.2d at 1388. The agreement lends itself to the interpretation that it covers the dispute, and in light of both that interpretation and the strong presumption in favor of arbitrability, the preliminary injunction must be denied and arbitration allowed to proceed.

The parties are to advise the Court in writing by January 6, 2006 as to whether any other outstanding matters are to be submitted for resolution by the Court. If so, the parties are instructed to submit by that date a proposed timetable for such a submission.

**SO ORDERED**

Dated: New York, New York
December 5, 2005

_____
U.S.D.J.

11